AUSA: WILLIAM K. STONE

# 24 MAG 3415

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JANELLE THOMAS,<br><br>Defendant. | **SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 371, 1344, 641 and 2<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

STEPHANIE LUK, being duly sworn, deposes, and says that she is a Special Agent with the United States Postal Service ("USPS") Office of Inspector General ("OIG"), and charges as follows:

## COUNT ONE
(Conspiracy to Steal Government Funds)

1. From at least in or about January 2023, up to and including at least in or about November 2023, in the Southern District of New York and elsewhere, JANELLE THOMAS, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, theft of funds from the United States Department of the Treasury, in violation of Title 18, United States Code, Section 641.

2. It was a part and object of the conspiracy that JANELLE THOMAS, the defendant, and others known and unknown, knowingly embezzled, stole, purloined, and converted to their use and the use of another, a record, voucher, money, and thing of value of the United States and a department and agency thereof, to wit, the United States Department of the Treasury, which exceeded the sum of $1,000, and received, concealed, and retained the same with intent to convert it to their use and gain, knowing it to have been embezzled, stolen, purloined, and converted.

### Overt Acts

3. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. Between in or about January 2023 through at least in or about November 2023, JANELLE THOMAS, the defendant, and another individual ("CC-1") communicated via text message to coordinate the delivery and cashing of stolen Treasury checks (the "Treasury Checks") at a post office in Manhattan where THOMAS was employed.

    b. Between in or about January 2023 through at least in or about November 2023, while employed at the post office, THOMAS unlawfully processed approximately 250 stolen Treasury Checks, amounting to approximately $200,000. THOMAS subsequently stole the

cash recovered from the processing of the stolen Treasury Checks and divided the proceeds in cash with CC-1.

c. Between in or about January 2023 through in or about November 2023, while employed at the same post office and tasked with sorting through mail, THOMAS stole checks intended to be received by other individuals. THOMAS subsequently altered the checks to be paid to herself and deposited them into a bank account that THOMAS controls (the "THOMAS Bank Account").

(Title 18, United States Code, Section 371.)

## COUNT TWO
(Theft of Government Funds)

4. From at least in or about January 2023, up to and including at least in or about November 2023, in the Southern District of New York and elsewhere, JANELLE THOMAS, the defendant, knowingly embezzled, stole, purloined, and converted to her use and the use of another, a record, voucher, money, and thing of value of the United States and a department and agency thereof, to wit, the United States Department of the Treasury, which exceeded the sum of $1,000, and received, concealed, and retained the same with intent to convert it to her use and gain, knowing it to have been embezzled, stolen, purloined, and converted, to wit, THOMAS processed and cashed Treasury checks issued to other persons without having lawful authority to do so.

(Title 18, United States Code, Sections 641 and 2.)

## COUNT THREE
(Bank Fraud)

5. From at least in or about January 2023, up to and including at least in or about May 2023, in the Southern District of New York and elsewhere, JANELLE THOMAS, the defendant, knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, THOMAS engaged in a scheme to make false statements to a financial institution in order to obtain funds, by processing and cashing checks issued to other individuals.

(Title 18, United States Code, Sections 1344 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

6. I am a Special Agent with the OIG and I have been personally involved in the investigation of this matter. I base this affidavit on that experience; on my conversations with other law enforcement officials; and on my examination of various reports, records, and videos. Because this affidavit is submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## **The Treasury Check Theft Scheme**

7.  As described further below, from at least in or about January 2023 to at least in or about November 2023, JANELLE THOMAS, the defendant, and CC-1 agreed to engage in a scheme involving the theft of more than $200,000 in Treasury checks. THOMAS was, at all relevant times, an employee at a particular USPS post office (the "Post Office") in Manhattan. CC-1 delivered stolen Treasury checks to THOMAS, including while THOMAS was working in the Post Office, and THOMAS cashed those stolen checks by using fabricated and false identifying information of third parties and by endorsing the checks purportedly in the third parties' names. THOMAS provided a portion of those cash proceeds to CC-1 and deposited a portion into the THOMAS Bank Account.

*Process for Cashing Treasury Checks*

8.  Based on my training, experience, and participation in this investigation, I have learned the following, in substance and in part, about the process for cashing checks issued by the U.S. Department of the Treasury (the "U.S. Treasury") at a USPS post office:

    a.  The U.S. Treasury issues checks on behalf of various government agencies, including the Internal Revenue Service, Social Security Administration, Veterans Affairs, and Office of Personnel Management. Generally, the front of a Treasury check contains the name and address of the recipient. The front of the check may also indicate the purpose of the payment, for example, a tax refund for a taxpayer or a retirement benefit for a federal worker.

    b.  Treasury checks issued by the U.S. Treasury are printed and mailed for distribution from U.S. Treasury facilities throughout the United States. Parcels containing Treasury checks destined for delivery in the Northeast United States, including to recipients in the Bronx and Manhattan, are routed through a particular USPS processing and distribution center in Manhattan (the "Processing and Distribution Center"), where they are sorted for distribution and mailing.

    c.  After the intended payee receives their Treasury check, the intended payee may bring it to a USPS post office to negotiate it into cash. A USPS sales clerk receives the Treasury checks from walk-in customers at the post office's teller window; reviews those checks and the accompanying identification information of the customers to confirm that they are, in fact, the intended recipients of the checks; and cashes the checks for the customers. USPS sales clerks are assigned unique identifying numbers that track their work, including when they cash Treasury checks.

9.  Based on my training, experience, and participation in this investigation, I know that the sales clerks at the Post Office generally engage in the following procedure to accept, review, and cash Treasury checks presented by USPS customers:

    a.  Once a customer approaches a teller window, the customer hands the Treasury check to the sales clerk;

    b.  The customer then submits two forms of identification to the sales clerk. Often these forms of identification include a New York State driver's license and a credit or debit card;

    c.  The sales clerk, while at the teller window, runs the Treasury check through a round dater, a machine which places a stamp on the check that includes, among other information, the date and time of the transaction as well as the sales clerk's unique, designated number;

    d.  The sales clerk ensures that the back of the Treasury check is endorsed or signed by the customer and then, on the back of the check, the sales clerk writes, in shorthand, the two forms of identification presented by the customer that the sales clerk used to confirm that the customer was the intended payee;

    e.  The sales clerk again runs the Treasury check through the round dater with the sales clerk's unique, designated number;

    f.  The sales clerk opens his or her cash register, takes cash out of the register, and hands the cash to the customer;

    g.  The sales clerk places the check inside the register; and

    h.  At the end of the day, the lead sales clerk counts and tallies all of the checks in the clerks' registers and fills out a deposit slip, for the value of all of the checks, to be deposited into the bank.

*THOMAS Obtains and Cashes Stolen Treasury Checks*

    10.  Since in or about March 2023, I have participated in an investigation of JANELLE THOMAS, the defendant, for her involvement in cashing stolen Treasury checks while employed as a sales clerk with the USPS. Based on my participation in that investigation, including my review of a USPS database, which records information, among other things, about individual transactions conducted by USPS employees (the "USPS Database Report"), I have learned that:

    a.  From at least in or about January 2023 to at least in or about November 2023, approximately 250 Treasury checks (the "Treasury Checks"), amounting to more than $200,000, were cashed in the Post Office and have THOMAS's unique, designated number stamped on them. Based on my training, experience, and participation in this investigation, I therefore believe that THOMAS was responsible for cashing the Treasury Checks in her role as a sales clerk at the Post Office.

    b.  The backs of the Treasury Checks contain at least two of the following: identification numbers, such as passport card numbers or driver's license numbers, and/or the names of a credit or debit card issuer, as well as expiration dates of one of the forms of identification. In addition, the back of the cashed Treasury Checks contains a stamp from the Post Office that includes the dates and times of the transactions.

c.  For each of the Treasury Checks processed by THOMAS between in or about January 2023 and in or about November 2023, I also investigated the customer identification number written on the backs of the checks, and according to records of the New York State's Department of Motor Vehicles ("DMV"), for 243 of the transactions, the identification numbers were determined to be non-existent. The remaining seven identification numbers, however, belonged to individuals with different names and addresses than that of the person to whom the Treasury Check was addressed. Accordingly, based on my review of these records, and my participation in this investigation, I believe that each of these Treasury Checks include customer identification numbers that THOMAS and/or a co-conspirator wrote on the back of the Treasury Checks and which are false or fabricated information for the purported payees.

11.  Based on my participation in this investigation, including my review of information contained in the USPS Database Report, my review of surveillance footage of JANELLE THOMAS, the defendant, while she was working in the Post Office, and my training and experience, I have learned the following:

a.  Surveillance video from the Post Office from in or about July 2023 to in or about November 2023 shows that, during some of the dates and times listed in the USPS Database Report for when THOMAS cashed the Treasury Checks, no customer appeared to be at THOMAS's teller window.

b.  Based on my review of the surveillance video, on several occasions from in or about July 2023 to in or about November 2023, THOMAS ran the Treasury Checks through the round dater twice. After completing the transactions, THOMAS took cash from her register and put the cash into her handbag either immediately following a given transaction or at the end of her shift. For example:

i.  On or about July 29, 2023, at approximately 3:24 PM, THOMAS ran a stolen Treasury Check in the amount of approximately $562.00 ("Treasury Check-1") through the round dater. THOMAS was not the listed payee on the Treasury Check. A still image of THOMAS from surveillance video shows THOMAS at her workstation in the Post Office putting cash into a handbag at approximately 3:27 PM, minutes after cashing Treasury Check-1.



ii. On or about September 5, 2023, at approximately 3:23 PM, THOMAS ran a stolen Treasury Check in the amount of $914.00 ("Treasury Check-2") through the round dater. THOMAS was not the listed payee on Treasury Check-2. USPS records reflect that Treasury Check-2 was routed to the Processing and Distribution Center but did not complete processing at the Processing and Distribution Center. Therefore, based on my training, experience, and participation in this investigation, I believe that Treasury Check-2 was likely intercepted and stolen from the mail system at the Processing and Distribution Center.

iii. As described above, THOMAS also cashed the Treasury Checks and took cash for them from her register at the end of her shift. For example, on or about November 13, 2023, at approximately 3:27 PM, THOMAS ran two stolen Treasury Checks in the amounts of approximately $1,098.00 ("Treasury Check-3") and $1,036.95 ("Treasury Check-4") through the round dater. THOMAS was not the intended recipient of those Treasury Checks. Still images of surveillance video from the Post Office showing THOMAS, approximately forty minutes later on the same date, counting the money in her register before placing some of the cash from her register inside an envelope and then into a handbag are below.

 

*THOMAS Deposits Proceeds of Stolen Treasury Checks*

12. Based on my review of records from financial institutions and the USPS Database Report, I know that, between in or about January 2023 and in or about November 2023, JANELLE THOMAS, the defendant, made several ATM deposits into the THOMAS Bank Account that correspond with the dates on which she processed stolen Treasury Checks at the Post Office.

a. For example, on or about April 4, 2023, while working at the Post Office, THOMAS cashed four Treasury Checks—that were not in her name—in the amounts of approximately $590.00, $768.00, $505.00, and $713.00, respectively. Later that day, on or about April 4, 2023, THOMAS traveled to an ATM affiliated with a bank that is located near the Post Office (the "Bank-1 ATM") and deposited approximately $800.00 into the THOMAS Bank Account. As discussed further below, based on my participation in this investigation, I have learned that THOMAS would retain approximately $200 for each of the cashed Treasury Checks.

6

(*See infra* ¶17.) Based on my participation in this investigation, I believe that this $800.00 deposit, therefore, is consistent with THOMAS having cashed four of the stolen Treasury Checks that day.

    b.  Similarly, on or about June 17, 2023, while working at the Post Office, THOMAS cashed two stolen Treasury Checks in the amounts of approximately $822.60 and $619.00, respectively. Later that day, surveillance cameras located near the Bank-1 ATM recorded THOMAS engaging in a transaction at the Bank-1 ATM. A few days later, on or about June 20, 2023, approximately $1,400.00 was listed as having been posted to the THOMAS Bank Account. A still image of THOMAS using the Bank-1 ATM to conduct this transaction on or about June 17, 2023, is below.



Date: 06/17/2023 16:15:06.75
Camera: 1 ML7679 VWU
Event: Surveillance
DVR: CFG-N7-341-9th-St-Amsterdam

    c.  Based on my participation in this investigation, including based on the timing, frequency, and value of these deposits, I believe that THOMAS made several deposits at the Bank-1 ATM, which consisted of the proceeds that THOMAS had unlawfully obtained as a result of cashing certain of the stolen Treasury Checks.

*THOMAS's Communications with CC-1*

  13.  Based on my participation in this investigation, including my review of text messages recovered from a cellphone belonging to JANELLE THOMAS, the defendant (the "THOMAS Cellphone"), which were obtained pursuant to a judicially authorized search warrant, my review of surveillance footage from July 2023 obtained from the Post Office, and my review of the USPS Database Report, I have learned the following, in substance and in part:

    a.  Based on my review of text messages from the THOMAS Cellphone, I have learned that THOMAS frequently communicated, from at least in or about January 2023 to at least in or about November 2023, with CC-1 regarding the delivery and cashing of the stolen Treasury Checks.

    b.  Based on my comparison of those text messages with information contained in the USPS Database Report, I have determined that at least some of the dates of the

communications between THOMAS and CC-1 regarding the Treasury Checks correspond with dates on which THOMAS cashed the Treasury Checks at the Post Office. For example:

        i.      On or about March 6, 2023, at approximately 9:45 AM, CC-1 messaged THOMAS stating, "Ok I got 3 914 so just lmk." Later that day, THOMAS replied, saying "Enough for 1." CC-1 responded that he was on his way and would "[b]e there at 3:40." Based on my training, experience, and participation in this investigation, I believe that CC-1 and THOMAS were discussing in this conversation that CC-1 would bring THOMAS three stolen Treasury Checks each in the amount of $914,[1] but THOMAS informed CC-1 that she only had enough cash in her register at the Post Office to process and cash one Treasury Check in that amount.

        ii.      On or about March 6, 2023, at approximately 4:05 PM, THOMAS processed one of the Treasury Checks made out to another individual in the amount of $914.00 ("Treasury Check-5"). I believe that Treasury Check-5 was the subject of the aforementioned text message exchange between THOMAS and CC-1.

        iii.      On or about March 7, 2023, at approximately 3:20 PM, CC-1 messaged THOMAS letting her know that he was "sending somebody else in." Minutes later, THOMAS replied asking, "How much is it." CC-1 responded, "914." That same day, at approximately 3:35 PM, THOMAS processed a Treasury Check made out to another individual in the amount of $914.00 ("Treasury Check-6"). I believe that Treasury Check-6 was the subject of the text message exchange between THOMAS and CC-1 on or about March 6, 2023, at approximately 9:45 AM.

        iv.      On or about July 1, 2023, at approximately 6:05 PM, CC-1 messaged THOMAS asking, "How much you did today baby." A few minutes later, THOMAS responded with a list containing several numerical values: "914 616 610 609." The USPS Database Report indicates that, on or about July 1, 2023, THOMAS processed four Treasury Checks made out to four different individuals in the amounts of approximately $914.00, $616.00, $610.50, and $609.34, respectively. I believe that these Treasury Checks were the subject of the text message exchange between THOMAS and CC-1 on or about July 1, 2023, at approximately 6:05 PM.

*THOMAS Shares Proceeds of the Scheme with CC-1*

14.     Based on my review of financial records obtained from a mobile payment service ("Payment Service-1"), I know the following:

        a.      Between in or about May 2023 and in or about August 2023, an account with Payment Service-1 registered in the name of JANELLE THOMAS, the defendant, and an account, which I believe to be controlled by CC-1 (the "CC-1 Payment Account"), exchanged approximately five payments.

        b.      These payments occurred on or about the dates on which THOMAS cashed Treasury Checks. For example, on or about May 11, 2023, at approximately 3:25 PM, THOMAS

---

[1] Based on my training an experience, I know that $914 is a common value of Treasury Checks.

8

cashed two Treasury Checks made out to other individuals in the amounts of $914.00 and $684.00, respectively ("Treasury Check-9" and "Treasury Check-10"). On the same day that THOMAS cashed Treasury Check-9 and Treasury Check-10, she exchanged two Payment Service-1 transactions with the CC-1 Payment Account.

### The Bank Fraud Scheme

15.     From at least in or about January 2023 to at least in or about May 2023, JANELLE THOMAS, the defendant, stole at least five checks from the Post Office where she worked, which were not issued by the U.S. Treasury, altered the names of the payees on the original checks, and re-wrote the checks to make it seem as if those checks were payable to her. THOMAS abused her employment with the USPS as a sales clerk to steal those checks, which amounted to approximately $19,570. THOMAS deposited the proceeds from these checks into the THOMAS Bank Account.

*THOMAS Cashes Stolen Personal and Business Checks*

16.     Based on my participation in this investigation, including my review of records and reports, I have learned the following:

   a.     From in or about January 2023 until in or about May 2024, JANELLE THOMAS, the defendant, deposited approximately five checks into the THOMAS Bank Account via mobile deposit. These checks appear to have been altered to be paid to "Janelle Thomas."

   b.     Based on my and other law enforcement officers' conversations with original remitters, I have learned that the checks were not originally made payable to THOMAS. I also know, based on my conversations with some of the original remitters, that these checks were mailed to PO Boxes at the Post Office where THOMAS works and has access to the mail. Images of three of these checks are reproduced below.





c.      On or about August 30, 2023, I spoke to the owner of a business listed as the payor on one of the business checks that THOMAS stole ("Victim-1"). I showed Victim-1 an image of the deposited business check. Victim-1 stated, in sum and substance, that Victim-1 mailed the business check, that the payee on the check that was deposited was different from the payee on the original check, that Victim-1 did not write the check to THOMAS, and that Victim-1 does not know an individual with THOMAS's name.

### THOMAS's Interview with OIG

17.     On or about March 12, 2024, OIG Agents and United States Postal Inspectors interviewed JANELLE THOMAS, the defendant at the Post Office. During that interview, to which THOMAS voluntarily consented after waiving her *Miranda* rights and signing a consent form, THOMAS admitted the following, in substance and in part:

a.      From in or about November 2022 until in or about March 2024, as a USPS sales clerk, THOMAS was responsible for sorting mail for PO Boxes at the Post Office.

b.      THOMAS stole certain checks mailed to the PO Boxes, those checks were not payable to her, and she had altered the checks by using "white-out" to change the payee names to her own name. THOMAS also used her personal mobile device to deposit those checks into her savings account.

c.      THOMAS fabricated the driver's license identification numbers on the backs of all of the Treasury Checks she cashed while working at the Post Office.

d.      THOMAS cashed stolen Treasury Checks only for CC-1.

e.      For a portion of the scheme, CC-1 would meet THOMAS either before THOMAS's shift or during her lunch break at the Post Office to give THOMAS stolen Treasury Checks.

f.      After cashing the Treasury Checks recovered by CC-1, THOMAS would put a portion of the cash in an envelope to give to CC-1 at a predetermined meeting place in Manhattan and would keep approximately $200 per stolen Treasury Check for herself.

WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of JANELLE THOMAS, the defendant, and that they be arrested and imprisoned, or bailed, as the case may be.

Stephanie Luk
Special Agent
United States Postal Service
Office of Inspector General

Sworn to before me this ___ day of September, 2024.

THE HONORABLE KATHARINE H. PARKER
United States Magistrate Judge
Southern District of New York

11